NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
JOSHUA O. MAUSNER (Cal. Bar No. 260251)
Assistant United States Attorney
Violent & Organized Crime Section
     1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0619
     Facsimile: (213) 894-3713
     E-mail:   joshua.mausner@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| IN RE: SEARCH WARRANT FOR THE PERSON OF SOHEYL FOROUZAN RAD | No.  2:19-MJ-1480 <br> GOVERNMENT'S EX PARTE APPLICATION TO UNSEAL SEARCH WARRANT, APPLICATION, AND AFFIDAVIT |
| --- | --- |

The United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Joshua O. Mausner, hereby files an Ex Parte Application To Unseal Search Warrant, Application, and Affidavit.

///

///

///

This Application is based upon the attached declaration of Joshua O. Mausner and exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: October 4, 2019                 Respectfully submitted,

                                       NICOLA T. HANNA
                                       Acting United States Attorney

                                       BRANDON D. FOX
                                       Assistant United States Attorney
                                       Chief, Criminal Division

                                       _____
                                       JOSHUA O. MAUSNER
                                       Assistant United States Attorney

                                       Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA

DECLARATION OF JOSHUA O. MAUSNER

I, Joshua O. Mausner, declare as follows:

1.    I am an Assistant United States Attorney in the United States Attorney's Office for Central District of California.  I have been assigned the task of unsealing the search warrant and affidavit in this matter.

2.    On April 11, 2019, the Honorable Jacquelin Chooljian issued a search warrant for the person of Soheyl Forouzan Rad.  A true and correct copy of the search warrant is attached hereto as Exhibit A.  A true and correct copy of the application and supporting affidavit is attached hereto as Exhibit B.

3.    On October 3, 2019, I was contacted by the affiant of the search warrant, Special Agent Forrest Silberstein, who requested that I obtain an order unsealing the search warrant.

4.    Special Agent Silberstein told me that Homeland Security Investigations ("HSI") would like to present the matter for prosecution by the Los Angeles County District Attorney's Office.  In order for the state prosecutor to comply with discovery obligations, he/she would need to produce a copy of the application for search warrant, including attachments A and B, the affidavit supporting the application, and the search warrant.

5.    The reasons to keep the warrant, application, and affidavit under seal – namely to prevent the target subject from learning about the impending searches and investigation – have now become moot.

///

///

///

6.   For these reasons, I seek an order unsealing the search warrant, application, and accompanying affidavit.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on October 4, 2019.

_____
JOSHUA O. MAUSNER

# EXHIBIT A

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The person of Soheyl Forouzan Rad as described further<br>in Attachment A-2 | )<br>)<br>)<br>)<br>)<br>) |

Case No.   2:19-MJ-1480

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Central_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

    See Attachment A-2.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

    See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below; you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ .
                                                      *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     *4/11/19 at 12:40 pm*

City and state:     Los Angeles, California

Judge's signature

Honorable Jacqueline Chooljian, U.S. Magistrate Judge
*Printed name and title*



AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>2:19-MJ-1480 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____


_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A-2

PERSON TO BE SEARCHED

The person to be searched is Soheyl Forouzan Rad ("RAD"), who is a Caucasian male and is approximately 37 years old. RAD is approximately five feet and nine inches tall with black hair and brown eyes.

**ATTACHMENT B**

**I.    ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography), and 2252A(a)(5)(B) (possession of child pornography) (the "Subject Offenses"), namely:

a.    Child pornography, as defined in 18 U.S.C. § 2256(8).

b.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in 18 U.S.C. § 2256(8), including but not limited to documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography.

c.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography, as defined in 18 U.S.C. § 2256.

d.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages,

iii

that refer or relate to any production, receipt, shipment, order, request, trade, purchase, or transaction of any kind involving the transmission through interstate commerce by any means, including by computer, of any visual depiction of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

    e.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, identifying persons transmitting in interstate commerce, including by computer, any visual depiction of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

    f.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

    g.    Any and all records, documents, programs, applications, or materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct.  Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

h.   Any records, documents, programs, applications, or materials identifying possible minor victims depicted in child pornography and/or minor victims of sexual abuse.

i.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to peer-to-peer file sharing software.

j.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to accounts with any Internet Service Provider.

k.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession of the SUBJECT RESIDENCE.

l.   Records, documents, and material relating to Internet Protocol address 104.175.214.5.

m.   Records, documents, programs, applications, materials, and files relating to the deletion, uploading, and/or acquisition of victim files to include photographs, videos, e-mails, chat logs, or other files.

n.   Records, documents, programs, applications, materials, and files relating to the online social media accounts of RAD or any victim.

o.   Any digital device used to facilitate the above-listed violations and forensic copies thereof.

p.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

q.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.     records of or information about
Internet Protocol addresses used by the device;

ix.   records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

## II.  SEARCH PROCEDURE FOR DIGITAL DEVICES

4.  In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.  Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.  The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.  The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

viii

ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

c. If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may

ix

retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

      g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

      h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

     5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

      a.   Any digital device capable of being used to commit, further, or store evidence of the offenses listed above;

      b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

      c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference
manuals regarding the operation of the digital device or
software used in the digital device;

e.    Any applications, utility programs, compilers,
interpreters, or other software used to facilitate direct or
indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles,
or similar physical items that are necessary to gain access to
the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys,
test keys, encryption codes, or other information necessary to
access the digital device or data stored on the digital device.

h.    After the completion of the search of the digital
devices, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

6.    During the execution of this search warrant, law
enforcement personnel are authorized to: (1) depress the thumb-
and/or fingerprints of RAD onto the fingerprint sensor of the
device(s) (only when the device(s) have such a sensor), and
direct which specific finger(s) and/or thumb(s) shall be
depressed; and (2) hold the device(s) in front of the face of
RAD with his eyes open to activate the facial-, iris-, or
retina-recognition feature, in order to gain access to the
contents of any such device(s).  In depressing RAD's thumb or
finger onto a device and in holding a device in front of RAD's
face, law enforcement may not use excessive force, as defined in

xi

Graham v. Connor, 490 U.S. 386 (1989); specifically, law
enforcement may use no more than objectively reasonable force in
light of the facts and circumstances confronting them.

      7.    The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

# EXHIBIT B

Case 2:19-mj-01480-DUTY *SEALED*   Document 1 *SEALED*   Filed 04/11/19   Page 1 of 38
Page ID #:1

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Central District of California



| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| The person of Soheyl Forouzan Rad as described further in Attachment A-2 | ) Case No.  2:19-MJ-1480 |

**FILED**
CLERK, U.S. DISTRICT COURT

APR 1 1 2019

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*  See Attachment A-2.

located in the _____ Central _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*  See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| See Attachment B | |

The application is based on these facts:  See affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/
*Applicant's signature*

Forrest Silberstein, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

**JACQUELINE CHOOLJIAN**

Date: _____ 04/11/2019 _____

*Judge's signature*

City and state:  Los Angeles,  California

Honorable Jacqueline Chooljian, U.S. Magistrate Judge
*Printed name and title*



COPY

FILED
CLERK, U.S. DISTRICT COURT

APR 1 1 2016

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

## **ATTACHMENT A-2**

### PERSON TO BE SEARCHED

The person to be searched is Soheyl Forouzan Rad ("RAD"), who is a Caucasian male and is approximately 37 years old.  RAD is approximately five feet and nine inches tall with black hair and brown eyes.

## ATTACHMENT B

### I.   ITEMS TO BE SEIZED

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography), and 2252A(a)(5)(B) (possession of child pornography) (the "Subject Offenses"), namely:

a.   Child pornography, as defined in 18 U.S.C. § 2256(8).

b.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in 18 U.S.C. § 2256(8), including but not limited to documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography.

c.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography, as defined in 18 U.S.C. § 2256.

d.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages,

that refer or relate to any production, receipt, shipment, order, request, trade, purchase, or transaction of any kind involving the transmission through interstate commerce by any means, including by computer, of any visual depiction of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

      e.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, identifying persons transmitting in interstate commerce, including by computer, any visual depiction of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

      f.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

      g.   Any and all records, documents, programs, applications, or materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct. Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

iv

h.   Any records, documents, programs, applications, or materials identifying possible minor victims depicted in child pornography and/or minor victims of sexual abuse.

i.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to peer-to-peer file sharing software.

j.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to accounts with any Internet Service Provider.

k.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession of the SUBJECT RESIDENCE.

l.   Records, documents, and material relating to Internet Protocol address 104.175.214.5.

m.   Records, documents, programs, applications, materials, and files relating to the deletion, uploading, and/or acquisition of victim files to include photographs, videos, e-mails, chat logs, or other files.

n.   Records, documents, programs, applications, materials, and files relating to the online social media accounts of RAD or any victim.

o.   Any digital device used to facilitate the above-listed violations and forensic copies thereof.

p.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

Case 2:19-mj-01480-DUTY *SEALED*   Document 1 *SEALED*   Filed 04/11/19   Page 6 of 38
Page ID #:6

q.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

          viii.    records of or information about Internet Protocol addresses used by the device;

          ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

vii

Case 2:19-mj-01480-DUTY *SEALED*   Document 1 *SEALED*   Filed 04/11/19   Page 8 of 38
Page ID #:8

## II.  <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

viii

      ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

      iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

      c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

      d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

      e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

      f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may

ix

retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offenses listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

      d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

      e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

      f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

      g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

      h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

    6.   During the execution of this search warrant, law enforcement personnel are authorized to: (1) depress the thumb- and/or fingerprints of RAD onto the fingerprint sensor of the device(s) (only when the device(s) have such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device(s) in front of the face of RAD with his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device(s).  In depressing RAD's thumb or finger onto a device and in holding a device in front of RAD's face, law enforcement may not use excessive force, as defined in

xi

<u>Graham v. Connor</u>, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

    7.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## **AFFIDAVIT**

I, Forrest Silberstein, being duly sworn, declare and state as follows:

### I. **PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of an application for warrants to search the following:

a.    the apartment located at 3420 South Sepulveda Boulevard, Apartment 516, Los Angeles, California, 90034 (the "SUBJECT RESIDENCE"), as described further in Attachment A-1.

b.    the person of Soheyl Forouzan Rad ("RAD") as described further in Attachment A-2.

2.    As described further in Attachment B, the requested warrants seek authorization to seize evidence, fruits, and instrumentalities, as specified in Attachment B, of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography), and 2252A(a)(5)(B) (possession of child pornography).

3.    The statements in this affidavit are based upon my personal observations, my training and experience, my investigation of this case, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.  BACKGROUND FOR SPECIAL AGENT FORREST SILBERSTEIN

4.    I am a Special Agent ("SA") with the Department of
Homeland Security, United States Immigration and Customs
Enforcement, Homeland Security Investigations ("HSI"), assigned
to the Los Angeles, California field office.  I have been so
employed since September 2015.  I am currently assigned to the
HSI Los Angeles Child Exploitation Investigations Group, where I
investigate criminal violations relating to child exploitation
and child pornography, including violations pertaining to the
illegal production, distribution, receipt, and possession of
child pornography.  I have received training in the areas of
child pornography and child exploitation investigations.
Because of the nature of my investigations, I have reviewed
examples of child pornography in many forms of media, including
computer media.  I have also successfully completed the Criminal
Investigator Training Program and the HSI SA Training Program at
the Federal Law Enforcement Training Center.  I am familiar with
the methods of operation used by people who are involved with
offenses involving the sexual exploitation of children,
particularly the way these people use the Internet to facilitate
their crimes.

## III.  BACKGROUND REGARDING CHILD EXPLOITATION OFFENSES, COMPUTERS, AND THE WORLDWIDE INTERNET COMPUTER COMMUNICATION NETWORK

5.    In this affidavit, the terms "minor," "sexually
explicit conduct," "visual depiction," and "child pornography"
are defined as set forth in 18 U.S.C. § 2256.  The term
"computer" is defined as set forth in 18 U.S.C. § 1030(e)(1).

2

6.    Based upon my training and experience in the investigation of child pornography, and information related to me by other law enforcement officers involved in the investigation of child pornography, I know the following information about the use of computers with child pornography:

a.    <u>Computers and Child Pornography</u>. Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized.  Child pornographers can now produce both still and moving images directly from a common video camera and can convert these images into computer-readable formats.  The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

b.    <u>Storage</u>.  The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography.  The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years.  These drives can store hundreds of thousands of images at very high resolution.  Images can also be stored on portable thumb drives and removable, external hard drives.

c.    <u>Internet Service Providers</u>.  Individuals and businesses obtain access to the Internet through an Internet Service Provider ("ISP").  ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that

3

allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers; remotely store electronic files on their customer's behalf; and may provide other services unique to each particular ISP. ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them. Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application information, and other information both in computer data and written record format.

        d.   <u>IP Addresses</u>. An Internet Protocol address ("IP Address") is a unique numeric address used to connect to the Internet. An IPv4 IP Address is a series of four numbers, each in the range 0-255, separated by periods (<u>e.g.</u>, 121.56.97.178). In simple terms, one computer in a home may connect directly to the Internet with an IP Address assigned by an ISP. What is now more typical is that one home may connect to the Internet using multiple digital devices simultaneously, including laptops, tablets, smart phones, smart televisions, and gaming systems, by way of example. Because the home subscriber typically only has one Internet connection and is only assigned one IP Address at a time by their ISP, multiple devices in a home are connected to the Internet via a router or hub. Internet activity from every device attached to the router or hub is utilizing the same external IP Address assigned by the ISP. The router or hub "routes" Internet traffic so that it reaches the proper device.

4

Most ISPs control a range of IP Addresses.  The IP Address for a user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning that the IP Address is only assigned for the duration of that online session.  Most ISPs maintain records of which subscriber was assigned which IP Address during an online session.

   e. <u>Hash Values</u>.  A hash value is a unique alpha-numeric identifier for a digital file.  A hash value is generated by a mathematical algorithm, based on the file's content.  A hash value is a file's "digital fingerprint" or "digital DNA."  Two files having identical content will have the same hash value, even if the file names are different.  On the other hand, any change to the data in a file, however slight, will change the file's hash value, even if the file name is unchanged.  Thus, if two files have the same hash value, they are said to be identical, even if they have different file names.

### IV.  BACKGROUND ON BITCOIN

  7. Bitcoin ("BTC") is a type of virtual currency, circulated over the internet.  BTC are not issued by any government, bank, or company, but rather are controlled through computer software operating via a decentralized, peer-to-peer network.  BTC is just one of many varieties of virtual currency.

  8. BTC are sent to and received from BTC "addresses."  A BTC address is somewhat analogous to a bank account number and is represented as a 26-to-35-character-long case-sensitive string of letters and numbers.  Each BTC address is controlled

through the use of a unique corresponding private key. This key
is the cryptographic equivalent of a password, or pin, and is
necessary to access the BTC address.  Only the holder of an
address' private key can authorize any transfers of BTC from
that address to other BTC addresses.  Users can operate multiple
BTC addresses at any given time and may use a unique BTC address
for each and every transaction.

9.   To acquire BTC, a typical user purchases them from a
BTC virtual currency exchange.   A virtual currency exchange is
a business that allows customers to trade virtual currencies for
other forms of value, such as conventional fiat money (e.g.,
U.S. dollars, Russian rubles, euros).  Exchanges can be brick-
and-mortar businesses (exchanging traditional payment methods
and virtual currencies) or online businesses (exchanging
electronically transferred money and virtual currencies).
Virtual currency exchanges doing business in the United States
are regulated under the Bank Secrecy Act and must collect
identifying information about their customers and verify their
clients' identities.

10.  To transfer BTC to another BTC address, the sender
transmits a transaction announcement, which is cryptographically
signed with the sender's private key, across the peer-to-peer
BTC network.  To complete a transaction, a sender needs only the
BTC address of the receiving party (who also has a private key)
and the sender's own private key.  These two keys by themselves
rarely reflect any identifying information about either sender
or recipient.  As a result, little-to-no personally identifiable

information about the sender or recipient is transmitted in a
BTC transaction itself.  Once the sender's transaction
announcement is verified by the network, the transaction is
added to the blockchain (a decentralized public ledger that
records every BTC transaction).  The blockchain logs every BTC
address that has ever received BTC and maintains records of
every transaction for each BTC address.

11.  While a BTC address owner's identity is generally
anonymous (unless the owner opts to make information about the
owner's BTC address publicly available), investigators can use
the blockchain to identify the owner of a particular BTC address
in the following way.  Because the blockchain serves as a
searchable public ledger of every BTC transaction, investigators
can trace transactions to, among other recipients, BTC
exchanges.  Because BTC exchanges generally collect identifying
information about their customers, as discussed above, subpoenas
or other appropriate legal process submitted to exchanges can,
in some instances, reveal the true identity of an individual
responsible for a BTC transaction.

12.  Blockchain analysis can also, in some instances,
reveal whether multiple BTC addresses are controlled by the same
individual or entity.  For example, the proprietor of a website
that accepts payment via BTC may create multiple different BTC
addresses in order to receive payments from different customers.
If the proprietor later decides to consolidate the BTC that it
has received from those customers, the proprietor may group
those many BTC addresses together to send a single transaction

into one BTC account.   Each of those many BTC addresses would
then appear as "inputs" on a single transaction on the
blockchain.   Therefore, if a known BTC address appears as an
"input" on a single transaction alongside other unknown
addresses, this may indicate that these addresses are all
controlled by the same user.   Additional examination of these
BTC addresses and their activity on the blockchain may also
reveal further information about the user and his/her previous
transactions.

13.   Law enforcement uses sophisticated commercial services
offered by several different blockchain-analysis companies to
investigate BTC transactions in this fashion.   These companies
analyze the blockchain in order to identify individuals or
groups involved with BTC transactions.   Specifically, by
analyzing the data underlying BTC transactions, these companies
create large databases that group BTC transactions into
"clusters."   This third-party analysis allows law enforcement
to identify BTC addresses that are included as "inputs" in the
same transaction and "cluster" these addresses together.   After
using this type of data in numerous unrelated investigations,
law enforcement has found the clustering information and
analysis provided by these companies to be reliable.

14.   Banks and law enforcement organizations worldwide use
this third-party blockchain-analysis software as, among other
things, an anti-money laundering tool.   It has supported many
investigations and been the basis for numerous search and
seizure warrants.   Further, computer scientists have

independently shown that they can use these "clustering" methods as clues to analyze how BTC are aggregated or split up, and to identify BTC addresses and their respective account owners.

### V. SUMMARY OF PROBABLE CAUSE

15.   HSI and Internal Revenue Service ("IRS") agents led an investigation into a website dedicated to the advertisement and distribution of child pornography where customers accessed the child pornography primarily by paying the website's administrator in BTC.  Using data derived from a clustering analysis like the kind discussed in paragraph 13, agents identified BTC exchanges that funded BTC accounts that sent BTC to the website's administrator.  Then, agents requested and received customer identifying information from these BTC exchanges.  One of those requests for customer information led agents to RAD and the SUBJECT RESIDENCE.

### VI.   STATEMENT OF PROBABLE CAUSE

#### A.   The Website

16.   "The Website" is a website dedicated to the advertisement and distribution of child pornography that operated as a hidden service on the Internet until March of 2018.[1]  On or about September 28, 2017, February 8, 2018, and

---

[1] The actual name of "The Website" is known to law enforcement.  HIS and IRS's investigation into The Website remains active and disclosure of the name of The Website would potentially alert its users to the fact that law enforcement action is being taken against users of The Website, thereby provoking users to notify other users of law enforcement action, flee, and/or destroy evidence.  Accordingly, to protect the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying

Case 2:19-mj-01480-DUTY *SEALED*   Document 1 *SEALED*   Filed 04/11/19   Page 22 of 38
Page ID #:22

February 22, 2018, law enforcement agents accessed The Website
and documented its content, which is described herein. The
Website was used to host and distribute image and video files
depicting child pornography and child erotica that could be
downloaded by site users.  In fact, the upload page on The
Website clearly stated: "Do not upload adult porn."

17.  Any user could create a free account on The Website by
creating a username and password.  Only after the user
registered an account could the user browse previews of videos
available for download and post text to The Website.  To
download videos from the site, the users were required to use
"points" that were allocated to users by The Website.  A
registered user could earn points from The Website in several
ways: (1) uploading videos depicting the sexual exploitation of
children; (2) referring new users to The Website; (3) paying for
a "VIP" account (which lasted for six months, entitled a user to
unlimited downloads, and was priced at 0.03 BTC (approximately
$327.60 as of March 1, 2018)); or (4) paying for points
incrementally (i.e., .02 BTC for 230 points).[2]

18.  When law enforcement agents accessed The Website, they
conducted an undercover purchase of a VIP account.  Based on
review of that activity, it appears that the Website provided
each user who accessed the site a unique BTC address to which

---

factors have been replaced with generic terms and the website
will be identified herein as "The Website."

[2] The price of BTC is volatile and can fluctuate on an
hourly basis.

the user could send funds for purchasing account privileges.  As discussed above, this is common when a BTC user wishes to receive payments from multiple different customers.

19.  Each video available for download had a title, a description (if added by the uploader), "tags" with further descriptions of the video which enable a user to more easily locate a particular category of video using The Website's search function, and a preview thumbnail image that contains approximately 16 unique still images from the video.  As of February 8, 2018, The Website had over 125,000 unique videos available for downloading.  In order to prevent duplicate videos from being uploaded, The Website checked the digital hash value of an uploaded video to compare it with other videos previously uploaded to the site.  The Website did not allow a user to upload a video whose hash value matched something previously uploaded to the site.  According to law enforcement's viewing of The Website as of February 8, 2018, the videos stored on The Website amount to over seven terabytes of data.  The Website indicated on its download page details that its users had downloaded files from The Website more than one million times.

20.  Law enforcement agents downloaded numerous video files from The Website.  These include one video that is approximately ten minutes long.  Law enforcement reviewed the preview stills of this video.  It depicts a prepubescent Asian girl who appears, from her small stature, lack of breast development, and absence of pubic hair, to be approximately nine to eleven years old.  The child is naked with her hands duct-taped to her ankles

on either side.  A naked adult male is vaginally penetrating the
child's vagina while simultaneously inserting multiple object
into the child's vagina.  It appears that this video was
uploaded by the site's administrator.

21.  Another downloaded video on the site is approximately
eight-and-a-half minutes long.  A user uploaded the video to the
site with the description of "8yo anal fucked pussy".  Law
enforcement reviewed the preview stills of the video.  The video
depicts a prepubescent girl who appears, from her small stature,
youthful appearance, and lack of breast development or pubic
hair, to be between the ages of six and eight years old.  The
child's underwear are pulled down around her thighs and the
child is positioned on all fours while a naked adult male
penetrates the child's vagina with his penis from behind.  The
adult male repositions the child and then moves the child in
several different positions while continuing to penetrate her
vagina with his penis.

22.  Other examples of videos from The Website include
depictions of toddlers and infants engaged in sexually explicit
conduct.  For example, law enforcement reviewed still images
from a video that is approximately one minute and twenty-three
seconds long, which depicts a toddler girl who appears to be
between the ages of approximately two and three years old.  The
video shows the child being anally penetrated by an adult male
while she cries into her hands.  The video zooms in to focus on
the toddler's vaginal area as the adult male penis penetrates
the toddler's anus.

23.    Law enforcement also reviewed the still images of a video that is approximately thirty-three minutes and forty-four seconds long, which depicts a baby approximately six months old who is holding an adult penis.  In another still frame, the adult male is holding his penis and inserting his penis into the baby's mouth.  In the last still frames, the adult male is forcing his penis into the baby's anus.  The images and videos discussed above are representative, but by no means exhaustive, examples of the types of videos available for download on The Website.

24.    On the video search page of The Website, there was a list of keyword search terms and the number of videos associated with the keyword.   As of February 8, 2018, some of the top keyword search terms included "PTHC" (over 10,000 videos), "PEDO" (over 7,000 videos), "2yo%" (over 4,000 videos) and "%4yo" (over 4,000 videos).[3]

25.    Law enforcement agents analyzed the source code from the Website's homepage and discovered an IP address associated with The Website that resolved to a telecommunications provider in a foreign country.  Subsequent investigation confirmed that this IP address was registered to an individual who investigators believed to be the administrator of The Website because an analysis of BTC transactions on The Website showed BTC passing into a bank account registered to that person (the "Suspected Administrator").  On February 28, 2018, a federal

---

[3] I am aware from training and experience that "PTHC" stands for "preteen hardcore," PEDO is a reference to "pedophile," and the references to "2yo" and "4yo" represent ages of children.

magistrate judge in the United States District Court for the District of Columbia issued an arrest warrant for the Suspected Administrator.

26.  On or about March 5, 2018, foreign law enforcement executed a search warrant at the residence of the Suspected Administrator, which is outside of the United States.  Pursuant to the search, foreign law enforcement seized The Website's server and associated electronic storage media from the home of the Suspected Administrator.  Foreign law enforcement then created and provided to United States law enforcement a forensic image copy of this data.  United States law enforcement subsequently obtained a federal search warrant to review this forensic image.

27.  Review of the imaged data confirmed that the seized server hosted The Website.  There were over 120,000 videos contained on the seized server.  A review of a sample of these videos corroborated that The Website appears to be entirely dedicated to child pornography.

**B.   Investigation of The Website Cluster Leads to RAD**

28.  In addition to the work United States law enforcement undertook to identify and arrest the Suspected Administrator, agents worked to identify The Website's customers.  Following the seizure of server that hosted The Website, agents confirmed that The Website assigned each customer a unique BTC address where the customer would send BTC payments when purchasing points to access content on The Website.  Using information provided by one of the commercial blockchain analysis services

14

described in paragraph 13, agents identified thousands of BTC addresses that were associated with The Website ("The Website Cluster").  After the blockchain analysis software identified The Website Cluster, it revealed that, from approximately October 2015 to approximately February 8, 2018, The Website Cluster received approximately 411 BTC.

29.  After identifying The Website Cluster, law enforcement requested customer identifying information from virtual currency exchanges whose customers sent BTC directly to addresses within The Website Cluster.  One such virtual currency exchange, a foreign BTC exchange called Binnance, provided customer identifying information for an account, identified as "13126655," (the "655 Account") that sent BTC to an address within The Website Cluster.  According to information provided by Binnance, the 655 Account included the following associated identifiers: 1) email account "SAM@AFFLUENCER.COM," (the "Subject Email Address") and 2) IP address "104.175.214.5," (the "Subject IP Address").

30.  Additionally, Binnance provided law enforcement with data that law enforcement used to determine that the 655 Account was funded with deposits from a United States-based BTC exchange called Bittrex.  On or about February 12, 2019, law enforcement sent a subpoena to Bittrex requesting information associated with the Bittrex account that funded the 655 Account.  In response to that subpoena, Bittrex identified the account that funded the 655 Account as "365add94-b2fa-4db2-8342-cf164f45a484," (the "484 Account") and noted several customer

identifiers associated with the 484 Account: 1) the Subject
Email Address, 2) subscriber name "Soheyl Rad," 3) a photograph
of RAD's California driver's license, and 4) telephone number
"310-770-7071," (the "Subject Phone Number").  Additionally,
Bittrex included a digital photograph of the holder of 484
Account.  As described in paragraph 32 below, I have met RAD in
person, and based on that interaction, I believe the photograph
provided by Bittrex depicts RAD.

   31.  Law enforcement reviewed the forensic image of the
electronic storage devices that hosted The Website and
determined that the 655 Account was associated with two user
accounts on The Website: "hellotherenowwhere," and
"hellohiimhere."  In a further review, agents noted that those
accounts made the following downloads from The Website:

   a.  On approximately January 16, 2018,
"hellotherenowhere," downloaded a video titled "ãƒ¬ãƒªå‹•ç"»"
(ä°œç‚„) [pthc] 2009 (gracel series) danielle 10yrs hard
fuck.mpg," which is approximately 26 minutes in length and
depicts an Asian female child who appears to be approximately 9-
12 years old based on her youthful appearance, small stature,
and undeveloped breasts.  The child is lying face down on a
circular table in what appears to be a living room.  There is a
nude adult male who is behind the child holding her legs apart
and appears to be sexually penetrating the child.  The vantage
point of the video is from the side.

   b.  On approximately January 16, 2018,
"hellotherenowhere," downloaded a video titled "April - Eye of

16

the tiger_x264.mp4" which is approximately 15 minutes in length and depicts a Caucasian female child who appears to be approximately 12-14 years old based on her youthful appearance, absence of pubic hair, and early breast development.  The child is outdoors in a grassy area with walkways, during the video the child undresses and masturbates.  Throughout the video the camera focuses on the child's vagina numerous times.

      c.  On approximately February 4, 2018, "hellohiimhere," downloaded a video titled "[pthc] 9y Latina Girl (Deep Anal + Creampie!).mpeg," which is approximately 12 minutes in length and depicts a Hispanic female child that appears to be between 8 and 10 years old based on her small stature, youthful appearance, absence of pubic hair, and undeveloped breasts.  The child is sitting on a red blanket with a pattern in a room with green walls and blue cabinets.  During the video, the child orally copulates an adult Hispanic male, the adult male orally copulates the child, and the adult male anally penetrates the child with his penis.

**C.  Further Investigation of RAD**

    32.  On or about February 13, 2019, I spoke to RAD in person at 3415 South Sepulveda Boulevard, Suite 1100, Los Angeles, California, which is the business address and location of RAD's business "Affluencer."  RAD stated that he is the owner of Affluencer and is the sole user of the Subject Email.

    33.  On or about February 13, 2019, I used a publicly-available database and determined the Subject IP Address was registered to Charter Communications ("Charter").  On or about

17

Case 2:19-mj-01480-DUTY *SEALED*   Document 1 *SEALED*   Filed 04/11/19   Page 30 of 38
Page ID #:30

February 15, 2019, I sent an administrative subpoena to Charter requesting subscriber information for the Subject IP Address. Charter's response identified the SUBJECT RESIDENCE as the address associated with the Subject IP Address.   Additionally, the response from Charter identified the email associated with the Subject IP Address as the Subject Email and the contact phone number associated with the Subject IP Address as the Subject Phone Number.

34.   The SUBJECT RESIDENCE is located within a multi-unit apartment complex that has numerous security features and physical barriers to block physical access to the complex by individuals not in possession of physical keys and door codes. On or about March 25, 2019, I spoke with DJ, the onsite Property Manager of the building that contains the SUBJECT RESIDENCE.   DJ is also a resident of the building that contains the SUBJECT RESIDENCE and lives on the same floor of the building as the SUBJECT RESIDENCE.   DJ advised that RAD is the current resident of the SUBJECT RESIDENCE and to DJ's knowledge RAD lives alone.

35.   Based on my training and experience, I know that individuals who collect child pornography often have a sexual interest in children and will travel to various international destinations to engage in sexual relationships with children, a practice often referred to as "sex tourism."   In light of this fact, I worked with United States Customs and Border Protection personnel to determine whether RAD had recently traveled internationally and discovered that RAD traveled alone to Pattaya, Thailand in March 2019.   Based on my training and

experience, I know that Pattaya, Thailand is a notorious
destination for underage sex tourism.

## VII.   TRAINING AND EXPERIENCE ON INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN

36.   Based on the facts set forth above, it is my opinion
that there is probable cause to believe that RAD is sexually
interested in children and collecting images of the sexual
exploitation of children.  Based on my training and experience,
and the training and experience of other law enforcement
officers with whom I have had discussions, I have learned that
individuals who view and possess multiple images of child
pornography are often individuals who have a sexual interest in
children and in images of children, and that there are certain
characteristics common to such individuals:

a.   Individuals who have a sexual interest in
children or images of children may receive sexual gratification,
stimulation, and satisfaction from contact with children; or
from fantasies they may have viewing children engaged in sexual
activity or in sexually suggestive poses, such as in person, in
photographs, or in other visual media, or from literature
describing such activity.  These individuals often maintain
possession of these items for long periods of time.

b.   Individuals who have a sexual interest in
children or images of children also may correspond with and/or
meet others to share information and materials (including
through digital distribution via the Internet); conceal such
correspondence as they share their sexually explicit material;

19

and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography. These individuals often maintain possession of these items for long periods of time.

37. The child pornography downloaded via the Subject IP Address at the SUBJECT RESIDENCE was in digital format and would have been downloaded onto a digital device. Digital child pornography on a digital device is easy to maintain for long periods of time. Modern digital devices often have extremely large storage capacities. Furthermore, cheap and readily available storage devices, such as thumb drives, external hard drives, and compact discs make it simple for individuals with a sexual interest in children to download child pornography from the Internet and save it — simply and securely — so it can be accessed or viewed indefinitely.

38. Furthermore, even if RAD deleted any images of child pornography that he may have possessed, received, or distributed, there is still probable cause to believe that there will be evidence of the illegal activities — that is, the possession, receipt and distribution of child pornography — at the SUBJECT RESIDENCE. Based on my training and experience, as well as my conversations with digital forensic experts, I know that remnants of such files can be recovered months or years after they have been deleted from a computer device. Evidence that child pornography files were downloaded and viewed can also be recovered, even after the files themselves have been deleted,

using readily available forensic tools.  Because remnants of the possession, receipt, distribution, and viewing of child pornography is recoverable after long periods of time, and because there is probable cause to believe that RAD at the SUBJECT RESIDENCE received and possessed child pornography on or about January 16, 2018 and February 4, 2018, there is probable cause to believe that evidence of child pornography will be found at the SUBJECT RESIDENCE.

39.  Additionally, a person who connects to the Internet must use a computer or mobile device, such as a tablet or wireless telephone, to facilitate that access.  Furthermore, in my training and experience, these devices typically travel with a subject or remain in their residence.  It is therefore reasonable to believe that computers, tablets, wireless telephones, and other electronic storage media may be present in the SUBJECT RESIDENCE.  Further, because it is possible to store certain mobile devices, such as removable storage media and wireless telephones, in a pocket, it is reasonable to believe that mobile devices may be found on the person of RAD.

**VIII.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES**[4]

40.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[4] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such

21

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

     a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

     b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

   41.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

      a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult

to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

42.   The search warrant requests authorization to use the biometric unlock features of the devices seized, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the

24

opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

       c.   As noted in paragraph 6d above, I know that most homes with Internet capability use only one IP address.  That IP address, in turn, is often shared by many devices that access the Internet using a wireless modem.  Accordingly, if there are multiple digital devices discovered during a search of the SUBJECT RESIDENCE or RAD, any of those devices could have been used to access the Internet and download the files discussed above in paragraphs 31a, 31b, and 31c.  Thus, if while executing the warrant, law enforcement personnel encounter a digital device within the scope of the warrant that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to: (1) depress RAD's thumb- and/or fingers on the devices; and (2) hold the devices in front of RAD's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

     43.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

//

25

Case 2:19-mj-01480-DUTY *SEALED*   Document 1 *SEALED*   Filed 04/11/19   Page 38 of 38
Page ID #:38

## IX.   CONCLUSION

44.   For all the reasons described above, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography), and 2252A(a)(5)(B) (possession of child pornography), as described in Attachment B, will be found in a search of the SUBJECT RESIDENCE and a search of RAD as described in, respectively, Attachments A-1 and A-2.

/s/
_____
Forrest Silberstein, Special Agent
Homeland Security Investigations

Subscribed to and sworn before
me this 11th day of April,
2019.

**JACQUELINE CHOOLJIAN**
_____
HONORABLE JACQUELINE CHOOLJIAN
UNITED STATES MAGISTRATE JUDGE